## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNIVERSITY LEGAL SERVICES, INC et al.,   )
                                               )
       Plaintiffs,                          )
                                               )
v.                                              )     Civil Action No. 1:05-CV-00585
                                               )
ST. ELIZABETHS HOSPITAL, et al.,        )
                                               )
       Defendants.                       )

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

NOW COME Plaintiffs University Legal Services, Inc. ("ULS"), and St. Elizabeths

Patients A and B, and pursuant to Federal Rule of Civil Procedure 65, hereby move this Court to

issue a preliminary injunction requiring defendants to take certain actions as set forth in the

accompanying memorandum to avoid further irreparable injury to the rights of residents at St.

Elizabeths Hospital to safe, sanitary and habitable conditions and access to adequate treatment

under the First and Fifth Amendments of the United States Constitution; Title II of the

Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.; Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794; D.C. Mental Health Consumers' Rights Protection Act of 2001,

D.C. Code Ann. § 7-1231.01 et seq.; and the D.C. Human Rights Act, D.C. Code Ann. § 2-1401

et seq.

     The grounds for this motion are set forth fully in the accompanying Memorandum of

Points and Authorities and exhibits appended thereto.

Pursuant to Local Rule 7(m), on Friday, March 25, 2005, Plaintiffs' counsel notified opposing counsel by telephone of their intention to file this motion and discussed the relief sought. Defendants opposed this motion.

Pursuant to Local Rules 7(f) and 65.1(d), Plaintiffs request a hearing to be set by the Court within the next 20 days.

WHEREFORE, for the reasons set forth above and in the accompanying memorandum, Plaintiffs respectfully request that this Motion be granted and that Plaintiffs be afforded all other and further relief that the law allows.

This 25th day of March, 2005.

Respectfully submitted,

Mary Nell Clark (DC 419732)
Robin Thorner (DC 485492)

UNIVERSITY LEGAL SERVICES, INC.
220 I Street, NE, Suite 130
Washington, D.C. 20002
(202) 547-0198

Richard A. Schneider (GA 629569)
Philip Moffat (DC 467733)

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 737-0500

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNIVERSITY LEGAL SERVICES, Inc., et al.,

    Plaintiffs,

    v.                                Civil Action No. 1:05CV00585

ST. ELIZABETHS HOSPITAL, et al.,

    Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

NOW COME Plaintiffs University Legal Services, Inc. ("ULS") and St. Elizabeths

Patients A and B and submit this memorandum in support of their motion for preliminary

injunction.  In this action, Plaintiffs seek to remedy the inadequate treatment and conditions

afforded to residents at St. Elizabeths in violation of their constitutional and statutory rights.  As

set forth herein, Defendant St. Elizabeths Hospital and the other Defendants who control it,

including the Department of Mental Health ("DMH"), have failed to provide adequate

individualized mental health treatment to each resident consumer of mental health services, and

the hospital is unsafe, unsanitary and understaffed.  Complete relief in this action will require a

wholesale review of the treatment and conditions at St. Elizabeths, and broad injunctive relief,

including the appointment of a supervising and independent expert and orders requiring

defendants to provide ULS the information it needs to perform its statutory role as the designated

protector and advocate for the mentally ill in the District of Columbia.

What Plaintiffs seek now, however, on an interim basis, is a preliminary injunction

affording a narrower subset of relief designed to remedy immediate issues of safety, sanitation,

staffing and access to medical services that currently cause irreparable deprivations of each

patient's rights each day that Defendants' current practices continue.  Specifically, Plaintiffs

request a preliminary injunction that requires defendants to do the following as spelled out in

further detail and schedule in the List of Injunctive Provisions Requested, attached as Ex. 31: (1)

ameliorate serious safety and sanitation issues; (2) increase staffing and improve competency of

staff to handle various serious problems, including the improper and overuse of seclusion and

restraint; and (3) ensure that individuals with mobility disabilities are afforded their rights under

Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation

Act ("Section 504").

ULS is the designated Protection and Advocacy Program for the District of Columbia,

whose federal statutory authority includes, among other things, the authority to "protect and

advocate the rights of [individuals with mental illness] through activities to ensure the

enforcement of the Constitution and Federal and State statutes."[1]  42 U.S.C § 10801.  ULS is

joined by two illustrative individual plaintiffs who are individuals with mental disabilities who

currently reside at St. Elizabeths, the public inpatient psychiatric hospital in the District of

Columbia.

Defendants can be predicted to respond that they have recently hired an expert -- Dr.

Fields -- and are currently developing a plan of improvement in response to his report citing

---

[1] ULS is authorized to seek preliminary and permanent injunctive relief on behalf of its constituents.  See Oregon Advocacy Center v. Mink, 322 F.3d 1101, 1121 (9th Cir. 2003); see also Doe v. Stincer, 175 F.3d 879 (11th Cir. 1999).  Also, the defendants DMH and the District of Columbia are directly liable for violations of constitutional, federal, and local statutory rights and can be sued directly in federal court for injunctive relief pursuant to 42 U.S.C. § 1983.  The District of Columbia is not a state and therefore the 11th Amendment does not prevent this court's assertion of jurisdiction.  See LaShawn v. Barry, 87 F.3d 1389 (D.C. Cir. 1996) (en banc decision holding that because D.C. is not a state, but rather is subject "to the plenary authority of Congress under Article I, Section 8, Clause 17 of the Constitution, the 11th Amendment does not apply to D.C.); see also Galloway v. Superior Ct. of the District of Columbia, 816 F. Supp 12 (D. D.C. 1993) (holding D.C. is a "person" for purposes of § 1983).  St. Elizabeths and the individual defendants Williams, Holland,, Knisley, Steury, and Gandhi are subject to suit as local government actors who are depriving St. Elizabeths residents of their rights, and are subject to suit under 42 U.S.C. § 1983.  See Monell v. Dept. of Social Servs. of City of New York, 436 U.S. 658 (1978)

2

numerous deficiencies.  See Fields Report[2] at 5, attached as Ex. 2.  Many of Dr. Fields'

recommendations are admirable, but there is no schedule of implementation, much less a court-

ordered schedule that will ensure action.  Patients do not recover on repeated promises of actions

that are never taken in a world where nothing changes.  Action is required, and only the force of

an injunction will achieve it.  Moreover, the residents at the hospital today and every day suffer

deprivations that require immediate action.  In addition to the preliminary and immediate relief

needed now, the overhaul and scrutiny of care and conditions at the hospital must be far more

dramatic than what has been suggested by Defendants thus far if Plaintiffs are to be afforded

their rights under the law.

     Under Fed. R. Civ. P. 65, Plaintiffs are entitled to preliminary injunction if they can show

(a) such an injunction is necessary to avoid irreparable harm; (b) Plaintiffs have a substantial

likelihood of prevailing on the merits of their claim that they are legally entitled to such an

injunction; (c) the requested injunction will not substantially injure other interested persons; and

(d) the injunction furthers the public interest.  Here, each of these requirements is met.

     The patients at St. Elizabeths are subjected to irreparable harm each day that they are

denied safe and sanitary conditions, denied access to treatment, and denied their rights under the

law.  There is a substantial likelihood that plaintiffs will prevail because each aspect of the

requested preliminary injunction corresponds to rights to adequate treatment and conditions

squarely protected by the provisions and statutes cited herein.  The requested injunction does no

harm to any interested person, and instead, simply requires the defendants to do what the law

requires them to do.  Finally, the injunction is in the public interest because it requires a public

---

[2] This Report and all other exhibits attached to the motion are true and accurate copies with redactions where
necessary to protect the confidentiality of a mental health consumer.  See Valente Authentications, attached as Ex. 1.
Plaintiffs will be filing under seal for review by the Court and defense counsel on a confidential basis the patient-
identifying information associated with patients now referenced by letter designation in the Complaint and in the
Exhibits attached hereto.

mental health hospital and those that control and operate it to put the patients first and provide them the immediate relief and appropriate care and conditions to which they are entitled under the law.  For all of these reasons, this motion for preliminary injunction should be granted.

## I.    INTRODUCTION

St. Elizabeths has a long history of chronic recurring problems, adversely affecting the quality of care provided to the patients hospitalized there.  See Fields Report at 7.  Defendants have chosen to deal with these problems merely with reactive fixes and stop gap measures.  See Fields Report at 8.  ULS began to express heightened concern about the conditions of care at St. Elizabeths in the spring of 2003 upon learning that an acutely ill patient with schizophrenia gouged out his eyes with his own hands.  See Patients in Peril at 3, attached as Ex. 3.  In the days preceding the injury and for months afterward, this patient spent most of his time – day and night – in restraints.  See id. at 8.  On several occasions, a single period of restraint lasted over a month.  See id.

Worried that this over-utilization of restraint was not unique to this patient, in late 2003, ULS, pursuant to its federal mandate, requested hospital-wide seclusion and restraint information, which confirmed ULS' fears.  Over a twelve-month period, at least five patients had been restrained almost continuously for a month or more at a time.  See generally St. Elizabeths Seclusion and Restraint Data, attached as Ex. 4.

In 2004, patients and staff were increasingly subject to dangerous conditions.  In early April, a violent patient-on-patient attack left a victim in a coma.  See Procaccino Decl., ¶¶ 5-9, attached as Ex. 5.  Three weeks later, an elderly female patient assaulted and killed another elderly woman on their ward.  See Procaccino Decl., ¶¶ 10-21.  Despite these alarming events, Defendants did little to address the conditions that gave rise to the patient harm.  ULS contacted

the Centers for Medicare and Medicaid Services ("CMS"), the federal agency responsible for

overseeing hospitals that receive federal funding to provide inpatient mental health treatment,

such as St. Elizabeths, to express concern about the hospital.  After an unannounced survey on

June 23, 2004, CMS found thirteen serious deficiencies at St. Elizabeths.  See generally 6/23/04

CMS Survey, attached as Ex. 6.  CMS rejected the hospital's first plan of correction because

eight of the planned corrective actions were unacceptable.  See 9/16/04 CMS Letter at 1,

attached as Ex. 7.

Faced with CMS' critical findings and the threat of losing its Medicare provider

agreement, see 9/16/04 CMS Letter at 2, in September 2004, Defendants reorganized the wards

at St. Elizabeths to create a distinct-part hospital – a smaller CMS-certified hospital within the

larger St. Elizabeths.  Defendants conducted a massive physical reorganization of patients and

direct care staff without providing any notice of the impending move to the patients or their

families.  See Valente Decl., ¶ 38, attached as Ex. 8; Decl. H, ¶ 6, attached as Ex. 9; Decl. F, ¶ 7,

attached as Ex. 10; Decl. G, ¶ 9, attached as Ex. 11; Decl. D, ¶ 10, attached as Ex. 12.  Presently

only four wards house patients for whom Defendants can bill CMS for federal reimbursement,

and over which CMS continues to exercise oversight.  The "non-paying" patients – those patients

for whose care Defendants are wholly financially responsible – live on ten civil and ten

forensic uncertified wards without any independent, outside federal oversight authority to ensure

patients are protected from harm.  St. Elizabeths does not even have Joint Commission on

Accreditation of Healthcare Organizations (JCAHO) [3] accreditation because it does not and

---

[3] JCAHO, an independent organization governed by a board that includes physicians, nurses and consumers, evaluates the quality and safety of care for more than 15,000 health care organizations, including psychiatric hospitals, throughout the U.S.  "JCAHO is the nationally acknowledged accrediting institution."  December 17, 2004 DMH Press Release at 2.

cannot satisfy the accreditation standards.  See 12/17/04 DMH Press Release at 2, attached as Ex. 13.

      In November 2004, ULS issued "Patients in Peril:  A Report on the Dangerous Conditions and Substandard Care at St. Elizabeths Hospital," and also communicated its intent to bring a lawsuit against Defendants for their failure to protect the patients at St. Elizabeths. Attached as Ex. 3;11/3/04 ULS Letter, attached as Ex. 14.  To forego litigation and ensure prompt relief for the patients, ULS proposed, among other things, convening a panel of mutually agreed upon independent experts with DMH, whose purpose would be to conduct a review of St. Elizabeths, make specific recommendations for improvement and provide independent accountability in the implementation of those recommendations.  Id. at 4-6.  After less than two weeks of discussion, DMH chose to hire its own expert, Richard Fields, M.D., of Fields and Associates, Inc., to conduct a review in December 2004.

      In his final report dated January 14, 2005, DMH's own expert confirmed most of the findings of ULS' report and the 6/23/04 CMS Survey.  Out of the seven areas for which DMH sought review, Dr. Fields found five that were in need of considerable improvement.  See generally Fields Report.  Dr. Fields noted that inconsistencies in staff adequacy, staff competency and seclusion and restraint practices "significantly increas[e] the risk to patient safety over time.  As such, serious adverse patient incidents will sporadically occur at rates consistent with the facility's recent history."  Id. at 10.  Although St. Elizabeths "has a number of chronic recurring concerns," Dr. Fields found no evidence that Defendants had addressed any of them, including the risk management data that consumer-on-consumer assaults are repeatedly considered high.  See id. at 6-7, 21.  In fact, the "cluster of incidents with extremely adverse patient outcomes in recent years and inconsistent CMS performance over the years more strongly

suggests that management has not succeeded in establishing (and/or maintaining) the systems necessary for consistent quality and safety." Id. at 7.

Dr. Fields' review of St. Elizabeths overlapped with CMS' return visit to evaluate the hospital's compliance with its plan of correction. While CMS found progress upon its return, the CMS surveyors could only evaluate four wards – housing only 88 patients – because Defendants had created a distinct-part hospital in the interim. See 10/12/04 DMH Letter attached as Ex. 16 (Ex. 15 omitted); 12/17/04 CMS Survey at 1, attached as Ex. 17. CMS found that St. Elizabeths continued to be deficient with respect to its medical records, a deficiency "of such serious nature as to substantially limit the hospital's capacity to provide adequate care." See 1/24/05 CMS Letter at 1, attached as Ex. 18. Specifically, St. Elizabeths "failed to provide treatment plans that identified patient-related long and short term goals in measurable, non-generalized terms… ." See 12/17/04 CMS Survey at 1-2. Tellingly, during Dr. Fields' review, he spoke with a nurse working on a non-certified ward who reported that she had not observed any improvements since the 6/23/04 CMS Survey. See Fields Report at 15.

## II.   STATEMENT OF FACTS

### A. St. Elizabeths is Unsafe

In Youngberg v. Romeo, 457 U.S. 307, 316 (1982), the Supreme Court found that individuals committed to a state mental health institution have a Fourteenth Amendment liberty interest in personal safety and security. The CMS regulations require that, among other things, participating hospitals must afford patients a safe environment in which to reside and receive care. See 42 C.F.R. § 482.41. "The condition of the physical plant and the overall hospital environment must be developed and maintained in such a manner that the safety and well-being

of patients are assured." 42 C.F.R. § 482.41(a). Here, St. Elizabeths' substandard living

conditions place both patients and staff at risk.

### 1.   The Facilities at St. Elizabeths are Unsanitary and Unsafe

The physical living conditions at St. Elizabeths are unsanitary and dangerous. Places in

the buildings smell of urine or are generally malodorous. See Valente Decl., ¶¶ 26, 36; Collins

Decl., ¶¶ 7-8, attached as Ex. 19.   On some wards, patients are permitted to wear clothing with

obvious fecal matter or menstrual blood on them. See Decl. H, ¶ 22; Decl. I, ¶ 16, attached as

Ex. 20; Collins Decl., ¶ 13; Decl. C, ¶ 7, attached as Ex. 21. Rats and mice are a common

problem on many of the patients' wards. See Valente Decl., ¶ 34; Decl. H, ¶ 16 ; Decl. F, ¶ 8;

Decl. B, ¶ 10, attached as Exh. 22; Decl. I, ¶ 11; Collins Decl. ¶ 8. The infestation is so bad, in

fact, that one patient had to throw away his winter coat because mice had nested in it. See Decl.

F, ¶ 9. The paint is peeling from the walls, the plaster is chipped away in places, furniture is

bug-infested and the physical environment looks nothing like a place for healing. See Decl. I, ¶¶

11, 15; Valente Decl., ¶ 28; Collins Decl., ¶ 6.

To participate in federal programs, St. Elizabeths must maintain adequate facilities for its

services, and the facilities, supplies and equipment must be maintained to ensure an acceptable

level of safety and quality. See 42 C.F.R. § 482.41(c)(2). Defendants have failed to come close

to satisfying this federal requirement. Because the physical plant is decrepit and equipment is

outdated, patients are routinely placed at risk. St. Elizabeths has experienced a series of

significant problems with its facilities that have affected the electrical and heating and cooling

systems. See 6/16/04 DMH Memo at 1-2, attached as Ex. 23; see also Fields Report at 15.  Heat

and hot water on the patients' wards are frequently interrupted. See Valente Decl., ¶ 22; Decl. C,

¶ 8; Decl. B, ¶ 6; Fields Report at 15; 6/16/04 DMH Memo at 1-2. When these problems

develop, it can take days for them to be fixed, especially if they happen over the weekend. See Decl. B, ¶ 6; Decl. C, ¶ 8. At other times, the heat is stifling and cannot be moderated. See Valente Decl., ¶ 27; Decl. I, ¶ 14.

Most recently, a sewer pipe burst behind a building that houses close to 150 patients, overwhelming both patients and staff with the smell of human waste. See Decl. I, ¶ 13. On one ward that houses 21 male patients, only two of the five toilets work, and only three of the five bathroom sinks work, problems that have persisted for months. See Decl. C, ¶ 9; Decl. B, ¶¶ 4-5. In addition, the antiquated elevators routinely stop functioning, sometimes with passengers inside. See Decl. B, ¶ 12; Decl. I, ¶ 12; Collins Decl., ¶ 14; Valente Decl., ¶ 37. In the Rehabilitation Medicine Building ("RMB"), which houses the more acute patients at St. Elizabeths, the elevators broke again on January 31, 2005. See Collins Dec., ¶ 14. Although the security guard informed visitors that the elevators were not functioning, Defendants failed to post any warnings indicating that the elevators were not operational. See id. Defendants' failure to take the necessary steps to eliminate this patient safety risk placed the patients at serious risk of irreparable harm. Such actions and omissions by Defendants are not unique. During Dr. Fields' evening visit to St. Elizabeths on December 13, 2004, for example, two repair needs were identified, one of which was a patient safety risk, yet the job tickets necessary for the repair work were not on file. See Fields Report at 17.

With an ailing physical plant and antiquated facilities, including a large oven that is condemned, _see_ Fields Report at 17, St. Elizabeths presents a serious fire safety risk placing the patients at risk of irreparable harm. Alarmingly, Defendants have not ensured that St. Elizabeths has current fire safety approvals. The CMS regulations require that St. Elizabeths maintain written evidence of regular inspection and approval by State or local fire control agencies, as

well as cooperation with fire fighting authorities.  See 42 C.F.R. § 482.41(b)(7) and (8).

However, Defendants do not have a license, certificate of need or approvals by the local fire

marshal to operate a hospital.  See 8/12/04 DMH E-mail and Attachment, attached as Ex. 24,

Item 38; Linton Decl., ¶ 4, attached as Ex. 25.  In fact, in response to ULS' Freedom of

Information Act request for, among other things, St. Elizabeths' permits, license, certification

and inspection reports, the D.C. Office of the Fire Marshal only produced a 2001 Notice of

Violation of the Fire Code and a 2002 application for a construction permit.  See generally July

1, 2004 Office of the Fire Marshal Facsimile to ULS, attached as Ex. 26.  As recently as

February 23, 2005, the D.C. Fire Prevention Bureau of the Office of the Fire Marshal confirmed

that St. Elizabeths has not had a fire inspection in many years.  See Linton Decl., ¶ 4.

In addition, Defendants place patients and staff at risk of irreparable harm every day that

St. Elizabeths continues to operate without an infection control program.  CMS requires St.

Elizabeths to provide a sanitary environment to avoid sources and transmission of infections and

communicable diseases, including an active program for the prevention, control and

investigation of infections and communicable diseases.  See 42 C.F.R. § 482.42.  St. Elizabeths

must also have a designated infection control officer who develops and implements policies

governing the control of infections and communicable diseases.  See 42 C.F.R. § 482.42(a).

Despite this requirement, Defendants do not have an Infection Control Coordinator or any

ongoing infection control committee function.  See Fields Report at 18.  This is an "immediate

need," as the Pharmacy and Therapeutics Committee and the Laboratory "are on crisis alert for

infection control issues."  Id.

## 2.  There Are Not Adequate Supplies

Not only must St. Elizabeths maintain safe facilities for the protection of its patients and staff, but it must also ensure that its supplies are adequate for patient safety. See 42 C.F.R. § 482.41(c)(2).  However, critical supplies are routinely in short supply.  Defendants fail to provide direct care staff with basic items such as soap, paper towels, laundry detergent, toilet paper and paper cups.  See Valente Decl., ¶ 30; see also Fields Report at 15-16.  In the absence of an infection control program, these deficiencies can be life-threatening.

Patients' access to personal care items is similarly limited.  For patients without money or family who can help, toiletries, such as shampoo, soap, toothpaste and deodorant, are hard to come by.  See Decl. B, ¶ 9.  Female patients are not provided with sanitary napkins.  See Decl. I, ¶ 16.  Staff bring personal care items to try to help compensate for the hospital's insufficient supplies.  See Valente Decl., ¶ 30.

The June 23, 2004 CMS Survey revealed insufficient gowns, blankets and other clothing items for twenty-six incontinent patients at St. Elizabeths.  See 6/23/04 CMS Survey at 10, 14.  Defendants failed to address the problem.  See Fields Report at 22.  At the time of Dr. Fields' survey in December 2004, the gowns still had not arrived.  See id.

The patients are in "constant need" of clothing at the hospital. See Valente Decl., ¶ 29.  The hospital no longer has a warehouse that supplies clothes and other patient essentials, so the staff bring in clothing on their own.  See Valente Decl., ¶¶ 30-31.  As a result of the clothing shortage, patients must go without shoes or other clothes items.  See Valente Decl., ¶ 31; Collins Decl., ¶ 12.  Blankets also remain in short supply.  When the heat went out on a ward at the John Howard Pavilion, the hospital's forensic division, in December 2004, the patients did not have enough blankets and were wearing coats to keep warm.  See Valente Decl., ¶ 24.  The following

month, in January 2005, the heat did not function properly on one of the non-certified geriatric wards and the hospital still did not have enough blankets.  See Valente Decl., ¶ 25.

## B.  Patients' Conditions of Care are Inadequate and Unsafe

Patients committed to St. Elizabeths have fundamental liberty interests that include the right to protection from harm, the right to be free from unnecessary confinement and restraint and the right to receive minimally adequate treatment to secure these rights.  See Youngberg, 457 U.S. at 319, 324.  In addition, as a hospital that participates in the Medicare program, St. Elizabeths "must be primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill persons."  See 42 C.F. R. § 482.1(a)(2).  The hospital must have sufficient staff "to carry out an active program of treatment."  See id.  And the hospital must provide this care in a safe setting.  See 42 C.F.R. § 482.12(c)(2).

### 1.  St. Elizabeths Is Overcrowded

Housing conditions are unsafe because, inter alia, the wards are overcrowded.  Wards in the RMB have a capacity of 23 patients.  See Census Reports, at 1, attached as Ex. 27.  Similarly, all but one of the forensic wards has a capacity of 23 patients.  See id. at 2.  The long-term wards, designated with "CT" before the ward number, have a capacity of sixteen patients.  See id. at 1.  CMS found that between April 1, 2004, and June 21, 2004, 75% of the civil wards had a census above the bed capacity.  See 6/23/04 CMS Survey at 23.  The CMS surveyors found that, at times, two geriatric wards with medically and physically fragile patients had five to fourteen patients more than ward capacity.  See id. at 24.  On yet another ward, the census was eleven patients over capacity and had five potentially assaultive patients.  See id. at 25.  Obviously, overcrowding impairs the delivery of nursing care.  See 6/23/04 CMS Survey at 16.

12

St. Elizabeths continues to operate with overcrowded wards. See Collins Decl., ¶¶ 15-17; Valente Decl., ¶¶ 6-7. Between November 1, 2004, and February 22, 2005, nine different wards on both the civil and forensic divisions have been over capacity a total of 166 times.[4] See Collins Decl., ¶ 16. On 66 occasions, RMB 5, the admission ward, which is not certified by CMS, has been over capacity by at least three patients. See Collins Decl., ¶ 17. St. Elizabeths' staff consistently complain that there are too many consumers for the size of the admission ward and the insufficient staffing. See Valente Decl., ¶¶ 6-9. For example, on January 11, 2005, the admission ward had 31 patients on it, see Valente Decl., ¶ 7, but over the weekend there had been 39 patients on the ward, which has an official bed capacity of only 23. See Collins Decl., ¶ 17. To attempt to deal with the overcrowding, five patients had been moved to another non-certified ward, causing its census to reach 27 patients – four patients over capacity. See Valente Decl., ¶ 7. None of the four CMS-certified wards have been over capacity once during this time period. See Collins Decl., ¶ 18.

## 2.  There Is An Insufficient Number of Adequately Trained Staff

St. Elizabeths lacks sufficient numbers of qualified direct care staff, and at times direct care staffing is "dangerously low." See Fields Report at 4, 18; see also 6/23/04 CMS Survey at 22. The CMS regulations require that St. Elizabeths, as a psychiatric hospital receiving Medicare reimbursement, have adequate numbers of qualified professional and supportive staff to evaluate patients, formulate written individualized comprehensive treatment plans, provide active treatment measures and engage in discharge planning. See 42 C.F.R. § 482.62. Staffing

---

[4] DMH began providing ULS census information on December 9, 2004, dating back to November 1, 2004. The census reports received from the Department of Mental Health are not always complete, and census information has been characterized as "missing" on at least ten days between November 1, 2004 and March 9, 2005.

deficiencies result in potential safety issues for patients and staff and hinder the provision of nursing care based on an individual patient's presenting needs.  See 6/23/04 CMS Survey at 16.

The nursing shortage is particularly grave.  Staff throughout the hospital complain that there are insufficient staff to provide treatment, coverage, and relief.  See Valente Decl., ¶ 8.

Dr. Fields found that nurse staffing and the systems that support it are in need of considerable improvement, and the "resulting inconsistencies of staffing and related effects (e.g., missed trainings, incomplete orientation, unnecessary restraint, etc.) . . . represent a significant risk over time."  See Fields Report at 4.  Little has changed since CMS found St. Elizabeths deficient for not ensuring the availability of a registered nurse ("RN") on each ward 24 hours a day.  See 6/23/04 CMS Survey at 21.  For example, during an evening shift visit on December 13, 2004, five of nine units had one or two less staff than required by St. Elizabeths' own minimum staffing guidelines.  See Fields Report at 4.  The evening unit nurse for several of the long-term care wards was responsible for 32 patients.  See Fields Report at 15.

According to St. Elizabeths' Nurse Executive, the overall nursing ratio is one RN for 30 patients, although her plan is to improve that ratio by half.  See Fields Report at 16.  Dr. Fields concluded that fifteen RNs need to be hired.  See Fields Report at 17.  That number is actually higher, as four RNs are retiring on April 1, 2005.  See Valente Decl., ¶ 11.

Because Defendants have not hired sufficient direct care staff, the staff is frequently reassigned to other units, where they do not receive adequate orientation to the ward, the location of medical and emergency equipment, knowledge about the patients, or their duties.  See Fields Report at 4, 16; Valente Decl., ¶ 10.  One nurse reported feeling unprepared when reassigned to other wards because she does not know the patients.  See Fields Report at 15.  The staff must also work overtime to try to meet minimum staffing levels, which can result in staff fatigue and

the inability to provide continuity of care for patients' needs. See 6/23/04 CMS Survey at 25-26; Valente Decl., ¶ 8.

Dr. Fields found that the psychology staff are specifically assigned to the four CMS-certified wards, but not the other civil wards. See Fields Report at 5. Consequently, patients on non-certified wards do not have sufficient access to psychological services. For example, a patient whom Dr. Fields believed could benefit from a behavior management plan did not have access to psychological services because he lived on a non-certified ward. See id.

Not only does St. Elizabeths lack sufficient numbers of direct care staff, but Defendants' own expert found that staff training and competency assurance is in need of considerable improvement, as are the systems that support these processes. See Fields Report at 4. Inadequate staff coverage compromises the staff's ability to attend hospital training. Dr. Fields found that 30% of the staff have not fulfilled current training requirements. See id.

### 3. Defendants Do Not Provide Patients Adequate Protection from Harm

As a direct result of the inadequate number of qualified professional and direct care staff, Defendants leave patients at serious risk. See Procaccino Decl., ¶ 16. Patients are not adequately protected from engaging in self-injurious behavior and/or harm-to-others. Id. For example, on April 4, 2004, a male patient punched a fellow male patient in the head, knocking him to the ground, and began stomping on his head and face. See Procaccino Decl., ¶ 5. Staff witnessed the incident from the beginning. When the nurse arrived, the injured patient was unconscious, bleeding profusely, and turning blue. She attempted to intervene and failed to stop the assault. See Procaccino Decl., ¶ 6. The victim suffered bleeding in his brain, which left him in a coma. See Procaccino Decl., ¶ 9.[5]

---

[5] ULS recently learned that John Doe has died.

Three weeks later, on April 23, 2004, an elderly female patient attacked another elderly female patient in the day room of their ward, resulting in the victim's death. See 6/23/04 CMS Survey at 19. The Medical Examiner found that the deceased patient suffered a fractured neck and blunt force trauma to the head. See Procaccino Decl., ¶ 11. The Medical Examiner's report ruled the death a homicide. See 6/23/04 CMS Survey at 19.

At the time of the attack, as many as 21 patients were in the day room, yet no staff persons witnessed the incident. See Procaccino Decl., ¶15. Only one RN was on the ward, her CPR license had expired and she had to be called three times before responding to calls for assistance. See Procaccino Decl., ¶¶ 17, 19. Two of the five staff persons on the ward were working double shifts; two of the five were covering from other wards; the RN had just returned after fourteen days away from the hospital; and only one staff person had been working regularly on the ward. See Procaccino Decl., ¶ 16.

Not only does this incident highlight the dangers of insufficient staffing, it demonstrates the inadequacy of the quality of care at St. Elizabeths. Staff persons improperly picked the unconscious patient up off the floor, even though she had fractured her neck, and placed her in a chair. See Procaccino Decl., ¶ 18. Moreover, although the investigation report concludes that death was instant or close to instant, the witnesses reported that the RN instructed staff to wait for the doctor to arrive before taking action, and the doctor then initiated a Code Blue and called 911. See Procaccino Decl., ¶¶ 19-20.

Moreover, the staff lack appropriate training to protect the patients from self-injurious behavior or from patient-on-patient attacks. Dr. Fields found that one patient had repeated self-injurious behavior even while assigned one-to-one supervision. See Fields Report at 5; see also Decl. G, ¶ 6; Decl. E, ¶ 9, attached as Ex. 28; Decl. A, ¶ 5, attached as Ex. 29.

In light of unpredictable staffing and patients' fear of their peers, the staff concede that St. Elizabeths is not safe. See Fields Report at 15. According to Dr. Fields, in 2004, staff on at least four of the long-term wards were injured and/or assaulted by patients eight times. Id.

### 4.  **Defendants Over-Utilize Physical and Chemical Restraints**

In lieu of using treatment to provide "training designed to ensure safety and freedom from undue restraint," Youngberg, 457 U.S. 307, 319 (1982), Defendants inappropriately rely on physical restraints, chemical restraints and seclusion to manage "problem" behaviors. See Valente Decl., ¶ 39; Collins Decl., ¶ 19; Procaccino Decl., ¶¶ 22-41; Decl. I, ¶¶ 6-7; Decl. E, ¶ 14; see also Fields Report at 4-5, 19-21.

Both federal and local law recognize that seclusion and restraint are emergency measures that should only be used to prevent imminent harm to the patient or others.  Seclusion and restraints are not treatment modalities. See 22A D.C.M.R. § 501.6.  The CMS regulations are clear: "Seclusion or restraint can only be used in emergency situations if needed to ensure the patient's physical safety and less restrictive interventions have been determined to be ineffective." 42 C.F.R. § 482.13(f)(2). Similarly, D.C. law emphasizes the dual criteria for emergency seclusion or restraint usage – prevention of serious injury when less restrictive treatment techniques have been tried or considered and determined to be ineffective. See D.C. Code § 7-1231.09(c); 22A D.C.M.R. § 501.2. St. Elizabeths' own abuse and neglect policy states that violation of the seclusion and restraint policy "constitutes patient abuse." St. Elizabeths Policy 301, "Investigation of Patient Abuse and Neglect," at 1, attached as Ex. 30.

Although Dr. Fields noted St. Elizabeths' decreased use of restraints and seclusion over the past six months, he found thirty-two episodes of restraints or seclusion involving nine patients over two months. See Fields Report at 19. Dr. Fields' findings demonstrate that St.

Elizabeths' staff regularly use seclusion and restraint improperly as a treatment modality in lieu of providing appropriate and adequate treatment planning and active treatment.  In a representative example, one patient had several restraint episodes over a three-day period, but treatment planning failed to address the patient's behavioral management needs.  See Fields Report at 20; 22A D.C.M.R. §§ 510.3-5, 510.7.  Another patient, already assigned one-to-one staff coverage, had daily restraint episodes November 3-5, 2004, two restraint episodes on November 6, 2004, and three restraint episodes on November 7, 2004.  Id.  Behavioral management assessments, treatment planning and debriefing must be initiated after each restraint episode, yet none of the reviewed records documented the required patient and staff debriefing following the episode.  See Fields Report at 19; see also 22A D.C.M.R. § 510.1.

Moreover, restraints and seclusion shall never be used as a means of coercion, discipline, convenience or retaliation.  See D.C. Code § 7-1231.09(a); 22A D.C.M.R. §§ 500.3, 501.7(a).  Restraint and seclusion are never to be used as punishment.  See Fields Report at 21.  Yet Dr. Fields found that two patients had restraint episodes following staff interactions; the staff did not allow one patient to use the telephone after a loud telephone call, while the other patient wanted to speak to a nurse and was told to wait.  See Fields Report at 20.  Similarly, restraints should not be used as a convenience or to compensate for insufficient staffing, see D.C. Code § 7-1231.09(a); 22A D.C.M.R. § 501.7(a), but Dr. Fields noted that utilization of a four-point restraint on December 14, 2004 might have been unnecessary had staffing been more adequate.  See Fields Report at 4-5.  Finally, restraint or seclusion episodes should be terminated at the earliest possible time, see D.C. Code § 7-1231.09(d)(4); 22A D.C.M.R. § 501.3(d), but staff continues the restraint or seclusion long after the patient has calmed down.  See Decl. I, ¶¶ 5-6.

For example, one patient was restrained even though she had calmed down, id. ¶ 5, and left in seclusion even after she had fallen asleep. Id. ¶ 6.

Similarly, medications may not be used as a restraint but "only in an emergency when the consumer presents an imminent risk of serious injury to self or others and when alternative techniques are determined to be ineffective." 22A D.C.M.R. § 514.2. Nevertheless, Defendants routinely rely on PRN[6], or "as needed," medications as behavior management tools or worse, as punishment. See Procaccino Decl., ¶¶ 29-30; Valente Decl., ¶ 39; Decl. I, ¶¶ 6-7. For example, one patient suffered huge welts on both of her arms from the excessive use of shots to sedate her. See Collins Decl., ¶ 20.

In 88 days at the hospital, a patient was administered 49 psychotropic and/or sedating medications given as PRN medications, in addition to her daily medication regimen that consisted of three and then four psychotropic medications. See Procaccino Decl., ¶¶ 22-24. In 40 of the 49 instances, the PRN medication was a combination of two or three psychotropic and/or sedating medications. See Procaccino Decl., ¶ 25. Altogether, in 25 of the 49 PRN administrations, the medical records contained either insufficient or no documented justification for administering the medication – that is, the records did not contain evidence of a documented emergency that the consumer presented an imminent risk of serious injury to self or others – or the records did not contain documentation that less restrictive alternatives were attempted. See Procaccino Decl., ¶ 26.

Similarly, during a 61-day period, Plaintiff A received 34 psychotropic and/or sedating medications as PRN medications in addition to his daily routine doses of four psychotropic

---

[6] "'PRN' medications are medications given pursuant to a physician's standing order which allows lower level hospital staff to use their own discretion to decide when to administer a drug. When it involves antipsychotic and related medications, it is a form of chemical restraint." Thomas S. v. Flaherty, 699 F. Supp. 1178, 1188 (W.D. N.C. 1988), aff'd., 902 F.2d 250 (4th Cir. 1990).

and/or sedating medications. See Procaccino Decl., ¶¶ 31-32.  In 23 of the 34  instances, the records contain either insufficient documented justification for administering the PRN or no documentation that less restrictive alternatives were attempted. See Procaccino Decl., ¶ 34.  On October 16, 2004, for example, a patient was given a PRN for no apparent reason after resting and smoking a cigarette. See Procaccino Decl., ¶ 36.  On November 22, 2004, the same patient was given a PRN injection, but the nurses' notes are silent as to the reasons. See Procaccino Decl., ¶ 41.

St. Elizabeths' own policy recognizes that the over-medication of patients to the point of interfering with daily activities or bodily functions constitutes pharmaceutical restraint and, therefore, patient abuse. See St. Elizabeths Policy 301, at 1.  In some instances, the PRN medications given to patients at St. Elizabeths seriously interfere with the patients' ability to move and function. See Collins Decl., ¶ 19; see also 22A D.C.M.R. § 514.3.

### 5.   Defendants Discriminate Against Individuals Who Have Problems With Mobility and Language Barriers

Patients who are involuntarily admitted to a state-operated psychiatric hospital, such as St. Elizabeths, have a Fifth Amendment right to adequate care and treatment. See Youngberg, 457 U.S. at 319-320.  Defendants fail to reasonably modify their policies, procedures, services and programs so as to make them accessible, thus making it virtually impossible for all patients to receive the treatment necessary to improve their mental condition.  While many patients at St. Elizabeths visit the "treatment mall" – a separate building where various group therapy sessions are held – Defendants fail to provide psychiatric care to many of the most acutely ill patients and patients who have problems with mobility.

To participate in Medicare, St. Elizabeths must provide a therapeutic activities program that is appropriate to the needs and interests of the patients and directed toward restoring and

maintaining optimal levels of physical and psychosocial functioning. See 42 C.F.R. § 482.62(g) (1). Accordingly, Defendants must have sufficient numbers of qualified therapists, support personnel and consultants to provide "comprehensive therapeutic activities consistent with each patient's active treatment program." 42 C.F.R. § 482.46(g)(2). These requirements extend to all patients at St. Elizabeths, not just those who live on the CMS-certified wards or who can travel to the treatment mall without difficulty, yet many patients who use wheelchairs receive little-to-no therapy at St. Elizabeths. See Decl. H, ¶ 7; Decl. E, ¶¶ 8-10. Instead, they spend their days watching television, listening to the radio or doing nothing at all, despite the patients' confinement to a psychiatric care facility for the very purpose of receiving mental health treatment. See Decl. H, ¶ 8; Decl. E, ¶¶ 7-8. Defendants' failure to provide a means by which these patients can participate in active mental health treatment places these individuals at risk of irreparable harm, including, but not limited to indefinite confinement at St. Elizabeths.

St. Elizabeths also fails to provide therapeutic programs to many of the most acutely ill patients at the hospital living on RMB 5 and RMB 6. The hospital offers these patients almost no activities whatsoever. See Valente Decl., ¶¶ 14-19; Collins Decl., ¶¶ 10-11; Decl. I, ¶ 10.

Additionally, Defendants do not make psychiatric care and treatment opportunities available to patients with language barriers. The CMS surveyors found that St. Elizabeths' staff failed to provide interpreters to ensure sufficient intensity of treatment services and, as a result, patients with language barriers had not benefited from needed therapeutic modalities that require understanding of the English language. See 6/23/04 CMS Survey at 3, 14. For example, Plaintiff A is Vietnamese and has difficulty communicating with the hospital staff, including his psychiatrist. See Decl. A, ¶ 7. Having recently moved to a new ward, he now attends some group therapy sessions during the week, but cannot participate fully given his limited English

21

skills. Id. Although he would very much like to have an interpreter to convey his feelings to the staff, the staff have never assisted him to obtain interpreter services. Id. Absent these interpreters, patients who do not speak English or have limited English skills are unable to receive adequate treatment and meaningfully participate in their care. Consequently their ability to have a reasonable opportunity to be cured is severely curtailed. See Ohlinger v. Watson, 652 F.2d 775 (9th Cir. 1980).

Defendants also provide few recreational activities at St. Elizabeths, especially in the evenings and on weekends. See Fields Report at 13-15; Decl. F, ¶ 10; Decl. H, ¶¶ 8, 11; Decl. I, ¶ 7; Decl. E, ¶¶ 10-12; Decl. A, ¶¶ 9-10; Decl. C, ¶ 10; Decl. B, ¶ 19. When the hospital does provide activities, these also are often denied to the more challenging patients or those with mobility disabilities. For example, on the evening of Dr. Fields' visit to the hospital, the fifteen patients on CT-3C, a non-certified ward, were unable to attend the holiday party because the ward did not have sufficient staff and the party was not accessible for the three patients who use wheelchairs. See Fields Report at 16. The experience of patients who use wheelchairs on the non-certified wards is common: Defendants do not make social, recreational, and religious opportunities available. See Decl. H, ¶ 12; Decl. F, ¶ 10; Decl. E, ¶¶ 10-12.

### 6. Defendants' Actions Foster Abuse and Harassment of Patients

The staff treat patients in a degrading fashion, violating their rights to dignity and privacy. Patients routinely complain that the staff treat them like babies, or worse, like they are not even human. See Decl. F, ¶ 11; Decl. H, ¶ 9; Decl. I, ¶ 4. The CMS regulations specify that patients have the right to be free from all forms of abuse or harassment. See 42 C.F.R. § 482.13(c)(3). The hospital's own policy prohibits verbal abuse, including threatening language or a disrespectful tone, pitch or loud voice. See St. Elizabeths Policy 301, at 2. Nevertheless, St.

Elizabeths' staff frequently speak to patients with little respect or courtesy. See Collins Decl., ¶ 9; Valente Decl., ¶ 5; Decl. F, ¶ 11; Decl. I, ¶ 4; Decl. B, ¶ 15; Decl. A, ¶ 6.

Defendants' disrespect for the patients in their care extends to the limited physical space afforded to patients. Patients have well-defined rights to personal privacy. See 42 C.F.R. § 482.13(c)(1). The overcrowded conditions, however, directly infringe on patients' privacy. See 6/23/04 CMS Survey at 23. Moreover, the staff do little to protect their patients' privacy. On one of the long-term geriatric wards, the staff change patients' clothes in the day room, exposing them to both the male and female patients on the ward. See Decl. H, ¶ 21. One patient who uses a wheelchair must leave the door to the bathroom open while he is using the toilet because the bathroom is not large enough to accommodate him and the chair. See Decl. H, ¶ 20. In another example, a female patient who needs assistance with her daily personal care was not provided with sanitary napkins when she began menstruating. In February, she was compelled to remain in blood-soaked clothes until ULS intervened on her behalf. See Decl. I, ¶ 16; see also Collins Decl., ¶ 13. Defendants' deprivation of patients' privacy comes at an obvious cost: "Lack of privacy can be expected to increase stress levels for the patients." 6/23/04 CMS Survey at 23.

Finally, patients are not given regular opportunities to go outside and get physical exercise. See Decl. I, ¶ 7; Decl. A, ¶ 4; Valente Decl., ¶ 19; D.C. Code § 7-1231.04 (e)(9) (consumers in residential, day, or inpatient treatment programs shall have "reasonable opportunities for regular physical exercise and freedom to go outdoors at regular and frequent intervals").

Patients who have provided information in this case fear retaliation by the hospital staff when they complain about conditions or the way they are being treated. See Decl. C, ¶ 6; Decl. I, ¶ 7;  Decl. H, ¶¶ 9-10; Decl. B, ¶ 23. Several patients have stated that they fear getting a

"shot" when they complain, ask questions, or express their point of view. See, e.g., Decl. I, ¶ 7; Decl. H, ¶¶ 9-10. Certain staff members have declined to give ULS information because they feared adverse personnel action. ULS has been told by staff members that they have been instructed, prior to the filing of this litigation, not to talk to ULS. See Valente Decl., ¶ 41.

## III.   STANDARD FOR A PRELIMINARY INJUNCTION

The standards for issuance of a preliminary injunction under Federal Rule of Civil Procedure 65(a) are well settled. A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will occur if the relief is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. Katz v. Georgetown Univ., 246 F.3d 685, 687 (D.C. Cir. 2001); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-1318 (D.C. Cir. 1998); Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Fed. R. Civ. P. 65(a).

These factors interrelate on a sliding scale and must be balanced against each other. Serono Labs, 158 F.3d at 1318. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995); see also Washington Metro., 559 F.2d at 843-44 (holding that the necessary showing on the merits is governed by the balance of equities as revealed through an examination of the other three factors). Additionally, this balancing test is a flexible one, permitting a court to issue preliminary injunctive relief when the likelihood of success is high, although probability of irreparable harm may be low, and vice versa. Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985); Brown v. Artery Org. Inc., 654 F. Supp. 1106, 1114 (D. D.C. 1987).

Here, as discussed more fully below, Plaintiffs easily satisfy all of the requirements for the issuance of a preliminary injunction.

## IV.   ARGUMENT

The Court immediately should enjoin Defendants from continuing to violate Plaintiffs' constitutional and statutory rights by subjecting them to dangerous, unsanitary living conditions and depriving them of adequate and timely psychiatric care.  As demonstrated below, Plaintiffs are likely to prevail upon the merits of their claims against Defendants, given the clear mandates from the Supreme Court, Congress, and the D.C. City Council as to the rights of individuals with mental illness.  In the absence of a preliminary injunction, Plaintiffs will continue to suffer serious and imminent irreparable harm to their physical and mental health and safety as a result of Defendants' unlawful conduct.  The aggregate benefits to the consumers at St. Elizabeths, and to the community at large, outweigh any inconvenience to Defendants who must provide certain resources and adequate care to patients, including the individual Plaintiffs here.  Moreover, granting a preliminary injunction would not adversely affect the public interest.  Rather, an injunction would serve the public interest by preventing Defendants from continuing to subject patients to unsafe and unsanitary conditions, as well as ending discriminatory conduct.

### A.  Plaintiffs will Suffer Imminent and Irreparable Injury if the Relief is Not Granted

To prevail on a request for preliminary injunction, Plaintiffs must demonstrate that they will suffer irreparable harm or injury if a preliminary injunction is not granted.  Katz, 246 F.3d at 687; Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958); McVeigh v. Cohen, 983 F. Supp. 215, 218 (D.D.C. 1998); Elzie v. Aspin, 841 F. Supp. 439, 442 (D. D.C. 1993).  As the facts illustrate, Plaintiffs are suffering in inadequate, unhealthy facilities where

safety is a constant concern and where understaffing and overcrowding create very real dangers. This constitutes a threat of irreparable harm.

Additionally, when an alleged deprivation of a constitutional right is involved, courts hold that no further showing of an irreparable injury is necessary.  See Elrod v. Burns, 427 U.S. 347, 373-74 (1976) (holding that irreparable injury was shown where First Amendment interests were clearly either threatened or in fact being impaired at the time a preliminary injunction was sought); see also National People's Action v. Village of Wilmette, 914 F.2d 1008, 1013 (7th Cir. 1990), cert. denied, 499 U.S. 921; Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984); Planned Parenthood v. Citizens for Community Action, 558 F.2d 861, 867 (8th Cir. 1977);  Henry v. Greenville Airport Comm'n, 284 F.2d 631, 633 (4th Cir. 1960) (holding "the District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right."); Quaker Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C. Cir. 1969) (deprivation of First Amendment right constitutes irreparable injury).

Irreparable harm may be presumed here because the Plaintiffs have clearly established that their constitutional rights are being violated.  Similar to the court's holding in Quaker Action Group, the Constitutional rights in this case – both Fifth Amendment and First Amendment – are so basic to our society that their deprivation should be found to constitute irreparable injury.

Moreover, a showing of irreparable injury may be presumed in certain instances of civil rights violations.  Therefore, "a traditional showing of irreparable harm is not required when a Plaintiff seeks equitable relief to prevent the violation of a federal statute . . . ."  McKinney v. Town Plan and Zoning Comm'n, 790 F. Supp. 1197 (D. Conn. 1992) citing Baxter v. City of Belleville, Ill., 720 F. Supp. 720, 734 (S.D. Ill. 1989).  Irreparable harm may be presumed in the

present case as in McKinney.  Plaintiffs seek injunctive relief to prevent further violations of

Title II of the ADA, Section 504, and constitutional and statutory claims.  Like the plaintiff in

McKinney, Plaintiffs have demonstrated facts sufficient to establish that patients' rights under

the ADA and Section 504 are being violated.

### B.  Plaintiffs Have a High Likelihood of Success on the Merits

#### 1.  Defendants' Failure to Provide Plaintiffs Safe Care Violates Plaintiffs' Substantive Due Process Rights

Patients committed at St. Elizabeths have a constitutional interest in adequate treatment

and safe conditions protected by the Due Process Clause of the Fifth Amendment to the United

States Constitution.  See Youngberg v. Romeo, 457 U.S. 307, 324 (1982); see also Oregon

Advocacy Center, Inc. v. Mink, 322 F.3d 1101, 1121 (9th Cir. 2003).  These fundamental liberty

interests include the right to protection from harm, the right to be free from unnecessary

confinement and restraint and the right to receive adequate treatment to secure these rights.  See

Youngberg, 457 U.S. at 319, 324; United States v. Jackson, 553 F.2d 109 (1977); Thomas S. v.

Flaherty, 902 F.2d 250 (4th Cir.), cert denied, 498 U.S. 951, 111 S. Ct. 373 (1990) ("Thomas S.

IV ").

Plaintiffs are likely to succeed on the merits of their claim that Defendants are depriving

patients at St. Elizabeths of their constitutional rights to personal safety and security.  The right

to personal security constitutes "an historic liberty interest" protected substantively by the Due

Process Clause.  Ingraham v. Wright, 430 U.S. 651, 673 (1977).  Indeed the courts have placed

such liberty interests at the "core of the liberty interest protected by the Due Process Clause from

arbitrary governmental action."  Youngberg, 457 U.S. at 316 (citation omitted).

In Youngberg, the Supreme Court found that individuals committed to a state institution

have a Fourteenth Amendment liberty interest in personal safety and security.  See id.; Estate of

Connors by Meredith v. O'Connor, 846 F.2d 1205 (9th Cir. 1988), cert denied, 489 U.S. 1065, 109 S. Ct. 1338 (1989) (finding that deceased patient who had been murdered by a forensic patient at a state-operated psychiatric hospital had a clearly established right to personal security and safety while at the hospital).

The District of Columbia assumes the constitutional duty to provide for the basic human needs of those whom it institutionalizes. Fialkowski v. Greenwich Home for Children, 683 F. Supp. 103, 105 (E.D. Pa. 1987); Sabo v. O'Bannon, 586 F. Supp. 1132, 1138-41 (E.D. Pa. 1984). When the District of Columbia takes individuals into its custody and holds them there against their will, the Constitution imposes a corresponding duty to assume some responsibility for their safety and general well-being. See DeShaney v. Winnebago County Dep't. of Social Servs., 489 U.S. 189, 199-200 (1989), citing Youngberg, 457 U.S. at 314-325.

Here, this "special relationship" between the District of Columbia, which owns and operates St. Elizabeths Hospital, and the patients who are confined to St. Elizabeths Hospital, gives rise to Plaintiffs' constitutional rights to personal security and protection from harm. The declarations of witnesses and the supporting documents attached hereto submitted in support of Plaintiffs' Motion for Preliminary Injunction, overwhelmingly demonstrate that Defendants have violated and continue to violate patients' rights. Specifically, Defendants: (1) fail to ensure that there are adequate numbers of staff on each unit to supervise and care for the patients so as to protect the patients from hurting themselves or being hurt by others; (2) fail to adequately supervise and train the staff – a staff that is demoralized and often ineffective because of systemic failures – thereby placing the patients at risk of being harmed by others or causing harm to themselves; (3) leave patients in an unsanitary and unsafe facility, creating health hazards and other safety risks; and (4) inappropriately use seclusion as well as both physical and chemical

28

restraints in an effort to manage patients' behavior.  Quite simply, the treatment that Defendants provide to patients at St. Elizabeths fails to meet professional and constitutional standards.

Overcrowding and insufficient staffing levels have led to dangerous and overall unsafe conditions in which the patients are compelled to reside.  The lack of adequate staffing has resulted in patients sustaining severe injuries or death by harming themselves and/or assaulting other patients, due, in part, to the lack of sufficient numbers of staff to supervise and provide protection to them.  See supra at II. B.1 and B.2.

Although the recent rearrangement of the wards has enabled the four CMS-certified wards to decrease their number of patients, the other wards, which house the majority of the patients, have taken the brunt of the new division.  RMB 5 and 6, non-certified wards, are routinely over census, and St. Elizabeths still lacks sufficient direct care staff.  See supra at II.B.1.

The unsafe and unsanitary conditions are overwhelming.  The rodents and other pests create health hazards, exacerbated by Defendants' failure to maintain an infection control program.  The peeling paint and the holes in the walls and floorboards may expose patients and staff to contaminants.  Broken sewer pipes not only create an unbearable smell, but there are obvious concerns about the safety of any areas exposed to human waste products.  See supra at II.A.1.

St. Elizabeths simply does not meet CMS' minimum environmental safety requirements. Defendants' inability to modulate indoor temperatures and guarantee an adequate supply of hot water not only aggravates poor physical health, but creates an unpleasant living and work environment for patients and staff alike.  See supra at II.A.1 and II.A.2.

The malfunctioning of the elevators creates a serious threat to both patients and staff, particularly those with physical disabilities who are incapable of climbing flights of stairs. More significant, however, is the failure to take adequate precautions when an elevator fails to work. Failure to cordon-off the elevator area and warn about such serious safety problems speaks volumes about the general lack of concern at St. Elizabeths. The D.C. Fire Marshal's failure to regularly inspect the facility is a tremendous threat to the safety of everyone at St. Elizabeths. See supra at II.A.1.

The conditions at St. Elizabeths are unsafe and unsanitary, and constitute an unconstitutional violation of the rights of the patients who are housed there. Absent preliminary injunctive relief, this irreparable harm will continue and the patients at St. Elizabeths will be at risk of further irreparable harm.

### 2. Defendants are Violating Plaintiffs' Rights to Adequate Care and Treatment

Patients who are involuntarily confined to a state-operated psychiatric hospital, such as St. Elizabeths, also have a Fifth Amendment right to adequate care and treatment. Youngberg, 457 U.S. at 319-320. Such care and treatment must provide the patient with a "realistic opportunity to be cured or to improve the mental condition for which they were confined." Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir. 2000); Brooks v. Morrow, 781 F.2d 367, 369 (4th Cir. 1986) cert. denied, Kirk v. Thomas S. by Brooks, 474 U.S. 1124 (1986).

"An essential element of the constitutional right to minimally adequate treatment is a humane physical and psychological environment." Flakes v. Percy, 511 F. Supp. 1325, 1339 (W.D. Wis. 1981); see generally Youngberg, 457 U.S. 307. "Plaintiffs have the constitutional right to minimally adequate habilitation . . . which will *tend* to render unnecessary the use of chemical restraint, shackles, solitary confinement, locked wards, or prolonged isolation from

one's normal community. . ." Thomas S. v. Flaherty, 699 F. Supp. 1178, 1200-1201 (W.D. N.C.

1988), aff'd, 902 F.2d (4th Cir. 1990) (italics in original). "Physical and chemical restraints must

not be used, inter alia, as punishment, for the convenience of the staff, or as a substitute for

activities or treatment." Lels v. Kavenaughz, 673 F. Supp. 828, 837 (N.D. Tex. 1987) (quoting

42 C.F.R. §§ 442.404, 442.438, 442.440). "It is a substantial departure from professional

standards to routinely rely on seclusion and restraint rather than systemic behavior techniques

such as social reinforcement to control aggressive behavior." Thomas S., 699 F. Supp. at 1189.[7]

In this case, Defendants have failed to provide adequate treatment to the patients living at

St. Elizabeths. The unsanitary and unsafe conditions of the physical plant, just described, make

treatment difficult if not impossible. Moreover, the overcrowding and under-staffing prevent

appropriate treatment from taking place. Instead, the staff often uses seclusion and physical and

chemical restraints to control patients rather than provide adequate care – all in violation of the

patients' constitutional rights. See generally, Procaccino Decl. Dr. Fields' finding of 32

episodes of restraints or seclusion involving nine patients over the course of two months

demonstrates such violation. In addition, Dr. Fields reported that at least one use of a four-point

restraint might not have been necessary were it not for inadequate staffing. Similarly, the use of

"PRNs" is excessive and done without following appropriate procedures. See supra at II.B.4.

Certain patients who have mobility issues or behavioral issues often do not receive any

treatment at all. Instead, Defendants "warehouse" them on one or two wards, where they can

choose to watch television, listen to the radio, or stare into space. Some of these patients may go

for very long periods of time without even leaving their ward. Other patients are so medicated

---

[7] See also id. at 1188 (drugs given to control a patient's behavior are a form of restraint).

that they are unable to benefit in any way from any "treatment" that may be presented to them.
See supra at II.B.5.

### 3.   Defendants' Violate Plaintiffs' Rights Under Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act

Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, et seq.
mandates that an individual with a disability may not be denied "participation in or be denied the
benefits of the services, programs, or activity" of a public entity "or be subjected to
discrimination" by a state or local government because of their disability.  42 U.S.C. § 12132.
Title II defines a "public entity" to include "any department, agency, special purpose, or other
instrumentality of a State or States or local government.  42 U.S.C. § 12131(1)(B); see Galloway
v. Superior Court of D.C., 816 F. Supp. 12 (D. D.C. 1993) (holding that the Superior Court and
the District of Columbia are public entities within the meaning of the Act based on this
definition).  It is clearly established that psychiatric hospitals, such as St. Elizabeths, are covered
entities.  See Olmstead v. L.C., 527 U.S. 581 (1999) (involving a challenge under the ADA for
the confinement of mentally ill patients in segregated settings at institutions); Kathleen S. v.
Dep't of Public Welfare of Commonwealth of Pa., 10 F. Supp. 2d 460 (E.D. Pa. 1998) (finding
that DPW had violated the ADA in an action by residents of a Pennsylvania psychiatric hospital
because they were not receiving services in the most integrated setting appropriate to their
needs); Williams v. Wasserman, 937 F. Supp. 524 (D. Md. 1996) (finding an ADA violation in
an action brought against state institutions by developmentally disabled residents**).**  The ADA
statute as a whole is intended "to provide a clear and comprehensive national mandate for the
elimination of discrimination against individuals with disabilities."  § 12101(b)(1).  The ADA
defines "disability," "with respect to an individual," as "a physical or mental impairment that

substantially limits one or more of the major life activities of such individual." Olmstead, 527

U.S. at 589, n. 2.

Public entities, such as St. Elizabeths, are required, under Title II of the ADA, to "make

reasonable modifications in policies, practices or procedures when the modifications are

necessary to avoid discrimination on the basis of disability, unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service,

program, or activity." 28 C.F.R. § 35.130(b)(7). For example, in Townsend v. Quasim, the court

held that Washington's Department of Social and Health Services was in violation of Title II of

the ADA by failing to provide long term care services in integrated settings to medically needy

disabled persons that it was already providing to others, unless it could show that providing such

services in community-based settings would fundamentally alter the nature of the services it

already was dispensing. 328 F.3d 511, 517-18 (9th Cir. 2003). The Title II Regulations at 28

C.F.R. §§ 35.130(a), (b)(1)(i), (b)(1)(ii), and (b)(1)(iii), specifically require that covered entities,

including psychiatric hospitals such as St. Elizabeths, make reasonable modifications in their

programs, practices and policies in (b)(7).

Such modifications include modifications in programs provided at state and locally

operated facilities such as state hospitals, jails, and prisons. See Messier v. Southbury Training

Sch., 916 F. Supp. 133 (D. Conn. 1996) (holding that residents of a state institution for the

mentally retarded had stated a valid claim under the ADA and Section 504 of the Rehabilitation

Act where they alleged that the institution excluded them from possible community placement

programs on the basis of the severity of their disability); Yeskey v. Commonwealth of Pa. Dep't

of Corr., 118 F.3d 168 (3d Cir. 1997) (holding that Title II of ADA was violated when state

prison excluded inmate from participation in correctional boot camp program on the basis of his

disability).  On appeal, the Supreme Court affirmed this decision, and held that state prisons fall squarely within Title II's statutory definition of "public entity."

In order to successfully state a claim under the ADA an individual must show: 1) he "is an individual with a disability," 2) he "is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" 3) he "was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and 4) "such exclusion, denial of benefits, or discrimination was by reason of [his] disability."  McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004) citing Thompson v. Davis, 295 F. 3d 890, 895 (9th Cir. 2002) (per curiam), cert. denied, 538 U.S. 921, 123 S. Ct. 1570 (2003).  Similarly, to establish a prima facie case under Section 504, a plaintiff must prove that: 1) he is an individual with a disability as defined by the Act; 2) he is otherwise qualified for the program or activity; 3) he was excluded from participation in or denied the benefits of the program, or subjected to discrimination because of his disability; and 4) the program receives federal financial assistance.  Ramirez v. D.C., 2000 WL 51778 (D. D.C. 2000).  There, the court held that the city's program for disabled students at an elementary school violated Title II and the Rehabilitation Act where it was not readily accessible to a student who used a wheelchair because it did not provide a restroom for him to use independently.  Id.

Because there are significant similarities between Title II of the ADA and Section 504 of the Rehabilitation Act, courts regularly apply them consistently.  See Radazeski on behalf of Radaszweski v. Maram, 383 F.3d 599, 607 (7th Cir. 2004) (stating, "[i]n view of the similarities between the relevant provisions of the ADA and the Rehabilitation Act and their implementing regulations, courts construe and apply them in a consistent manner"); Frederick L. v. Dep't of

Public Welfare of Pa., 364 F.3d 487, 491 (3d Cir. 2004)(stating "[t]he ADA largely mirrors

Section 504 of the RA . . . [w]e have construed the provisions of the RA and the ADA in light of

their close similarity of language and purpose"); Ferrell v. Howard University, 1999 WL

1290834 (D. D.C. 1999) (setting forth that the ADA and Section 504 of the Rehabilitation Act

have the same standards for the establishment of a violation).

Plaintiffs here easily satisfy all of the requirements. All individuals admitted to St.

Elizabeths are persons with mental disabilities, many of whom also have physical disabilities that

require the use of a wheelchair, as well as cognitive and speech disabilities. The patients at St.

Elizabeths qualify as individuals with a disability because their disabilities impair at least one

major life function. All residents of St. Elizabeths have some form of mental and/or emotional

illness, which, on varying levels from individual to individual, impairs their ability to care for

themselves, to learn, or to work, each of which constitute "major life activities."   Many patients

at St. Elizabeths also have physical disabilities.

Second, there can be no doubt that these individuals are "otherwise qualified" to

participate in or receive the benefit of St. Elizabeths services, programs, or activities particularly

given that they are patients in the hospital and were admitted to receive treatment from these

very services, programs, or activities that they are being denied. When the District exercises its

authority to involuntarily commit an individual to St. Elizabeths, it does so with the clear

expectation that the individual will receive the services and treatment necessary to return to the

community. For those patients with physical disabilities or cognitive disabilities for whom the

hospital does not provide adequate programs, services and activities, involuntary confinement

becomes nothing more than warehousing. Without access to adequate programs, services, and

activities, these groups of patients have more limited opportunities to effective, timely discharge

planning.  Under present conditions at St. Elizabeths, patients are left to languish in one of the most restrictive institutional settings possible – a locked psychiatric ward at a public mental hospital.

Plaintiffs have also shown that patients with disabilities are being excluded from Defendants' programs.  While many patients visit the treatment mall at St. Elizabeths during the week in order to attend group therapy sessions, patients with mobility disabilities are often not able to attend because they cannot get to the mall without assistance.  See supra at II.B.5.  They are simply told that there is no staff person available to take them to the treatment mall. Furthermore, patients who use wheelchairs are denied opportunities to go outdoors, attend special holiday celebrations, and even attend church because there is no staff available to assist them in accessing, or transport them to, these activities.  See supra at II.B.5.

These individuals have been specifically denied participation in St. Elizabeths' activities, programs, and services precisely because of their disabilities.

Making the necessary modifications required to prevent continued violation of these disabled patients' rights under Title II of the ADA and Section 504 will not cause an undue burden on Defendants because the services (however questionable some of the "active treatment" may be) are already being provided.  Nor will making the necessary modifications cause Defendants to fundamentally alter their services because Plaintiffs are not asking for additional services or programs – they are simply asking that transportation and staff be provided to assist these disabled individuals in participating in the existing programs and services to the same extent as all other patients at St. Elizabeths.  Defendants' violations of the ADA likewise constitute violations of Section 504 and must be enjoined.

### 4. Defendants' Actions Violate Plaintiffs' Statutory Rights Under the District of Columbia Mental Health Consumers' Rights Protection Act

Along with the Constitutional and federal requirements outlined above, the District of Columbia Mental Health Consumers' Rights Protection Act ("MHCRPA"), D.C. Code § 7-1231.01, et seq., as well as other statutory rights in the District of Columbia, impose additional requirements on Defendants.

#### a. Defendants treat patients inhumanely

Specifically, the MHCRPA requires DMH and all providers to, inter alia, treat the consumers with consideration and respect for their dignity, autonomy, and privacy. § 7-1231.04(a). DMH and the hospital have continuously failed to treat the consumers at St. Elizabeths with consideration or respect for their dignity, autonomy and privacy. Patients routinely complain that the staff at St. Elizabeths treats them like children, or even like animals. See supra at II.B.6. One patient reported that one staff member repeatedly yells at him that he is not moving quickly enough down the hallway in his wheelchair. See Decl. H, ¶ 9.

Moreover, patients often have little to no privacy. See supra at II.B.6. Patients have been exposed to staff members undressing other patients in the day rooms, exposing their naked bodies to other male and female patients on the ward. Because many of the bathrooms are not physically accessible, patients who use wheelchairs are forced to use the toilet with the door open so that others can see – a humiliating experience. In addition, another patient described not being provided with sanitary napkins during her menstrual cycle, thereby forcing her to walk around in blood-soaked clothes.

#### b. Defendants' refuse to provide mental health services free of discrimination, harassment, abuse and neglect

The MHCRPA also states that consumers shall:

> have access to mental health services and mental health supports free of
> discrimination on the basis of … disability, source of income…

§ 7-1231.04(b).

> be free from physical, emotional, sexual, or financial abuse, neglect, harassment,
> coercion, and exploitation when seeking or receiving mental health services and
> mental health supports.

§ 7-1231.04(c).

Defendants have violated each of these statutory mandates. First, since September 2004, when the hospital was divided to become a distinct-part hospital, patients in the ward that receive Medicare reimbursement have received improved staffing ratios and been subjected to less overcrowding. See supra at Introduction and II.B.1. The daily census shows that RMB 1 through 4 have not had more than 23 patients, whereas RMB 5 and 6 are often overcrowded. See supra at II.B.1. Patients have received disparate treatment based on their source of payment for their hospital stay. Moreover, Defendants violated the MHCRPA's mandate that patients be treated with respect and consideration when the hospital staff provided no preparation for, or explanation of, the transition. See D.C. Code § 7-1231.04(a). When the wards were segregated, patients were left standing outside in the rain, disoriented and confused. See supra at II.B.1.

Patients at St. Elizabeths experience physical and emotional abuse, neglect, harassment, and coercion in violation of the MHCRPA. It is the height of neglect to force a patient to walk around in blood-soaked clothes because no one would provide her with sanitary napkins. See supra at II.B.6. More egregiously, however, are the events of patient-on-patient violence. In early April 2004, one patient-on-patient attack left the victim in a coma. In another event three weeks later, an elderly female patient assaulted and killed another elderly woman on the ward. See supra at II.B.3. These kinds of horrific events are the direct result of Defendants' failure to

provide adequate staffing and prevent overcrowding at the hospital.  They are also a direct

violation of the MHCRPA.  <u>See</u> D.C. Code §7-1231.04(c).

c.        **Defendants' fail to provide mental health services in the
least restrictive, most integrated environment appropriate
to their individual needs**

The MHCRPA also states that consumers shall:

> receive their individual mental health services and mental health supports in the
> least restrictive, most integrated setting appropriate to their individual needs.

§ 7-1231.04(d).

Additionally, consumers in residential, day or inpatient treatment programs shall have

"reasonable opportunities for regular physical exercise and freedom to go outdoors at regular and

frequent intervals."  <u>Id.</u> at (e)(9).

Patients at St. Elizabeths do not receive mental health services in the least restrictive,

most integrated setting appropriate to their individual needs, as the statute requires.  Not only are

patients subjected to seclusion and restraint in excess of statutory restrictions as well as the

hospital's own policy, <u>see</u> <u>supra</u> at II.B.4, but Defendants have repeatedly failed to provide

patients with mental health services in a setting appropriate to their individual needs.  For

example, many patients at the hospital visit the treatment mall during the week to attend various

group therapy sessions.  However, Defendants do not provide psychiatric care on the treatment

mall to many of the most acutely ill patients or to patients with mobility disabilities.  In fact,

many patients who use wheelchairs receive inadequate treatment at St. Elizabeths.  <u>See</u> <u>supra</u> at

II.B.5.  Instead, their "treatment" consists of sitting in front of a television all day long, listening

to the radio, or doing nothing at all.  <u>Id.</u>

Defendants also have violated §7-1231.04(e) of the MHCRPA because patients are often

confined inside the wards for long periods of time with no opportunity to experience the fresh air

39

outside.  Patients report that they never get to go outside, unless it is to get on a bus to go to the

treatment mall, especially those patients who use wheelchairs.  See supra at II.B.6.

<strong>d.        Defendants' illegal use of seclusion and restraint</strong>

The MHCRPA also declares that consumers "have the right to be free from seclusion

and restraint of any form that is not medically necessary or that is used as a means of coercion,

discipline, convenience, or retaliation by staff."  D.C. Code § 7-1231.09(a).  It also provides that

seclusion and restraint can be used only in an emergency when:

> (1) The use of seclusion or restraint is, in the written opinion of the attending
>     physician, necessary to prevent serious injury to the consumer or others;
> (2) Less restrictive interventions have been considered and determined to be
>     ineffective to prevent serious injury to the consumer or others; and
> (3) Pursuant to the written order of the attending physician, which shall never be
>     written as a standing order or on an as-needed basis, and which must be
>     followed by consultation with the consumer's treating physician as soon as
>     possible if the order was not written by the consumer's treating physician.

D.C. Code § 7-1231.09(c).

The statute states that any use of seclusion or restraint shall be:

> (1) Implemented in the least restrictive manner possible;
> (2) Implemented in accordance with safe and appropriate seclusion or restraint
>     techniques;
> (3) Continually assessed, monitored, and reevaluated; and
> (4) Ended at the earliest possible time.

Id. at (d).  Finally, the statute also prescribes that no use of seclusion or restraint may extend

beyond a 24-hour period.  Id. at (g).

Patients at St. Elizabeths are often subject to forms of seclusion and restrain that violate

the MHCRPA.  Physical and chemical restraints are used to control "problem" patients because

the hospital is understaffed and does not formulate appropriate treatment plans.  Instead,

Defendants rely on the use of physical and chemical restraints to manage patients.  See supra at

II.B.4.

Dr. Fields found 32 episodes of restraints or seclusion involving nine patients in a two month period.  See Fields Report at 9.  Dr. Fields also found that "restraints were implemented that probably could have been avoided."  Id. at 6.  Despite that fact that restraints and seclusion shall never be used as a means of coercion, discipline, convenience or retaliation, see D.C. Code §7-1231.09(a), Dr. Fields described instances where restraints were used as punishment.

Defendants also routinely rely on PRN, or "as needed," medications as behavior management tools even though seclusion or restraint can only be used "in an emergency when less restrictive interventions have been considered and determine to be ineffective to prevent serious injury to the consumer or others."  See supra at II.B.4.  Patients have expressed fear of asking for anything from the staff, even for something as simple as a newspaper, because they do not want to be seen as a "problem."  Patients who are problems "get shots."  See Decl. H, ¶ 9.

Each of these instances is representative of the Defendants' egregious violations of both the letter and spirit of the D.C. Mental Health Consumer's Rights Protection Act and must be enjoined.  This Court should grant Plaintiffs' Motion for Preliminary Injunction and order Defendants to take the actions set forth in the List of Injunctive Provisions Requested, attached as Exhibit 31.

### 5.  Defendants' Actions Violate Plaintiffs' Statutory Rights Under the District of Columbia Human Rights Act

The goal of the D.C. Human Rights Act, D.C. Code § 2-1402, et seq., ("DCHRA") is to ensure every individual "an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life."  D.C. Code § 2-1402.01 (2002).  The DCHRA is a broad remedial statute, and it is to be construed liberally.  George Washington Univ. v. D.C. Bd. of Zoning Adjustment, 831 A.2d 921 (D.C. 2003).  The DCHRA prohibits discrimination based on a comprehensive list of factors,

including national origin, disability, and source of income. Id. Furthermore, the discriminatory

practices are prohibited in employment, public accommodations, education, public services, and

other aspects of life. D.C. Code § 2-1402.11, .21, .31, .41. A place of "public accommodation"

has a broad definition that includes establishments where people eat, drink, sleep, and many

other forms of public activity. D.C. Code § 2-1401.24. It includes accommodations for those

seeking health, recreation or rest. D.C. Code § 2-1401.24. St. Elizabeths constitutes a place of

public accommodation because it is an establishment providing food, drink, shelter, and other

forms of public activity for individuals with mental illness.

     The DCHRA applies to the District of Columbia pursuant to § 2-1402.73, which

specifically states, "it shall be an unlawful discriminatory practice for a District government

agency or office to limit or refuse to provide any facility, service, program, or benefit to any

individual on the basis of an individual's actual or perceived: . . . national origin, . . . disability, .

. . source of income." The DCHRA applies to St. Elizabeths because it is owned and operated by

the D.C. government.

     Defendants' violations of Title II of the ADA, Section 504 of the Rehabilitation Act, and

the D.C. Mental Health Consumers' Rights Protection Act, see supra at IV.B.4 and IV.B.5,

constitute violations of Plaintiffs' rights under the Human Rights Act. District of Columbia

courts determine the elements of a prima facie case of disability discrimination under the

DCHRA based on cases decided under analogous federal anti-discrimination laws. Whitbeck v.

Vital Signs, Inc., 159 F.3d 1369 (D.C. Cir. 1998) (applying standards from the ADA as evidence

of discrimination under the DCHRA); see also Dickerson v. SecTek, Inc., 238 F. Supp. 2d 66

(D.D.C. 2002) (holding the legal standard for discrimination under the DCHRA is substantively

the same as under Title VII of the Civil Rights Act). Moreover, the DCHRA also states that "any

practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68. As already established, Defendants have violated standards set by the ADA, Section 504 and the D.C. MHCRPA. These violations of the DCHRA must be enjoined. The Court should grant Plaintiffs' Motion for Preliminary Injunction and order Defendants to act in accordance with the law and to take the actions set forth in the List of Injunctive Provisions Requested, attached as Exhibit 31.

## C. Preliminary Injunctive Relief Would Not Substantially Injure Other Interested Parties

In the absence of a preliminary injunction, Plaintiffs continue to be at risk of serious injury by Defendants' failure to provide safe, sanitary conditions, and adequate treatment and care. By contrast, Defendants will only be required to act in accordance with the law by remedying the well-documented dangerous and unacceptable conditions at the hospital. As Plaintiffs have shown, Defendants have failed to provide adequate care, treatment, and protection from harm to the plaintiffs and those who are similarly situated. As a result, the patients at St. Elizabeths have been and continue to reside on wards that are consistently over census, unsanitary, and inadequately staffed and supervised. See supra at II.A.1, II.B.1, and II.B.2. Additionally, the patients are subjected to a risk of serious physical harm and assault from others and themselves. This harm has and is likely to continue to lead to further inappropriate use of seclusion and restraint, serious injury and, in some instances, death. See supra at II.B.3. and II.B.4. Additionally, as shown in the discussion at IV.B.3 supra, certain patients are routinely denied adequate care and active treatment because of their disabilities. This denial also has caused patients at St. Elizabeths irreparable harm, and absent preliminary injunctive relief, they are at risk of continuing to suffer such harm.

43

In contrast, while Defendants may be compelled to spend money to preliminarily remedy the inadequate conditions of care at St. Elizabeths to provide a safe and therapeutic environment for Plaintiffs, when balanced against the lives of the patients at St. Elizabeths, the balance tips strongly in favor of Plaintiffs. Additionally, the "lack of funds, staff or facilities, cannot justify the State's failure to provide [those confined] with treatment necessary for rehabilitation." Turay v. Seling, 108 F. Supp. 2d 1148, 1151, aff'd in relevant part, 2001 WL 725277 (9th Cir. June 27, 2001); Rouse v. Cameron, 373 F.2d 451, 457 (D.C. Cir. 1966).

Thus, the harm suffered by Defendants if subjected to a preliminary injunction in this case is substantially less than the irreparable harm and risk of irreparable harm that the Plaintiffs have and are likely to continue to suffer if a preliminary injunction does not issue. The balance of the hardships in this case strongly favors Plaintiffs.

### D. The Public Interest is Served By Issuance of a Preliminary Injunction in This Case

The final factor bearing on the court's determination whether to issue a preliminary injunction is the public interest. Express One Int'l, Inc. v. United States Postal Servs., 814 F. Supp. 87, 92 (D. D.C. 1992) (granting preliminary injunction to defer mail service contract award in order to further the public interest in ensuring fairness and equity in the contracting process). The fact that the public interest as expressed by Congress or District officials may be served through enforcement of a federal statute and D.C. law weigh heavily in favor of granting a preliminary injunction. The Fund for Animals v. Clark, 27 F. Supp.2d 8, 14 (D. D.C. 1998) (finding the public interest would by served by an environmental impact study mandated by the National Environmental Policy Act and granting preliminary injunction to block an organized bison hunt in national parklands). The court in Fund for Animals concluded that the public has a general interest in "the meticulous compliance with the law by public officials." Id. at 14.

The public interest considerations in this case clearly weigh in favor of Plaintiffs, such that the public interest will be served by granting Plaintiffs' Motion.  First and foremost, doing so will protect the lives of individuals who are especially vulnerable.  Should an injunction issue, consumers of mental health services in the District of Columbia will be better served by being protected from unsafe and unsanitary conditions at the hospital, and will receive the care and treatment to which they are entitled.   It will also further the intent of Congress in passing Title II of the ADA and Section 504 of the Rehabilitation Act.  Finally, it will effectuate the civil rights protections of District of Columbia law.  This Court should enjoin Defendants continuing violation of law and order Defendants to act in accordance with the law and as required by the attached proposed order.

## V.    **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction and enter an order which requires Defendants to take the actions set forth in the List of Injunctive Provisions Requested attached as Exhibit 31.

Respectfully submitted,

Mary Nell Clark (DC 419732)
Robin Thorner (DC 485492)

UNIVERSITY LEGAL SERVICES, INC.
220 I Street, NE, Suite 130
Washington, D.C. 20002
(202) 547-0198

Richard A. Schneider (GA 629569)
Philip Moffat (DC 467733)

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C.  20006
(202) 737-0500

Deborah A. Dorfman
Washington Protection & Advocacy System
1315 5th Avenue South, Ste. 850
Seattle, Washington 98104
(206) 324-1521

Attorneys for Plaintiffs

This 25th day of March, 2005.