UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNIVERSITY LEGAL SERVICES, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v.  ) | Civ. No. 1:05-CV-00585 (TFH) |
| ) | |
| **ST. ELIZABETHS HOSPITAL, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Pending before the Court are Defendants' motion to dismiss and Plaintiffs' motion for a preliminary injunction. Upon careful consideration of the parties' motions, the entire record herein, and the record from another litigation alleged to be related, the Court grants in part and denies in part Defendants' motion to dismiss and denies Plaintiffs' motion for a preliminary injunction at this time.

### I. BACKGROUND

Plaintiffs are University Legal Services, Inc. ("ULS") and two individual inpatients at St. Elizabeths Hospital ("Plaintiffs A and B"). On March 21, 2005, Plaintiffs filed a complaint for declaratory judgment and injunctive relief regarding treatment and conditions at St. Elizabeths Hospital against the following Defendants: (i) St. Elizabeths Hospital and Chief Executive Officer Joy Holland, (ii) the District of Columbia Department of Mental Health ("DMH"), Director Martha B. Knisley, and Chief Clinical Officer Dr. Steve Steury, and (iii) the District of Columbia ("District"), Mayor Anthony Williams, and Chief Financial Officer Natwar Gandhi. Additionally, Plaintiffs allege that the DMH wrongfully denied ULS's request for access to patient records pursuant to 42 U.S.C. § 10805. Plaintiffs subsequently filed a motion for a

preliminary injunction requiring Defendants, among other things, to improve staffing, ensure safe and habitable conditions, and provide adequate treatment for the residents of St. Elizabeths Hospital. Defendants filed a motion to dismiss Plaintiffs' complaint on various grounds. Due to an Order Transferring Case, this matter was transferred to the present Judge on May 17, 2005, who held a hearing for oral argument regarding these motions on June 30, 2005 pursuant to the parties' request.

This case arises separately from Dixon v. Williams, No. 74-285, an ongoing class action lawsuit that also addresses patient care issues at St. Elizabeths Hospital.[1] In the original Dixon litigation in 1975, the class sought "a judicial declaration that . . . [it had] a right to treatment which includes facilities outside St. Elizabeths Hospital." Dixon v. Weinberger, 405 F. Supp. 974, 976 (D.D.C. 1975) (emphasis omitted). The Court found that class members have a statutory right to treatment in "suitable residential facilities under the least restrictive conditions consistent with the [relevant statutory] purpose." Id. at 980. Thus, any District mental health patient who qualifies as a class member is entitled to treatment in community-based, outpatient facilities. Dixon v. Barry, 967 F. Supp. 535, 537 (D.D.C. 1997) (noting Dixon v. Weinberger holding that "adequate treatment included treatment in alternative facilities when the Hospital determined that such treatment was appropriate."). Attempts to implement this holding, however, have required the Court to enter a series of consent orders and implementation plans over the last thirty years, and implementation is still ongoing. See id. at 538-41 (discussing, inter alia, 1980 Consent Order and Final Implementation Plan, 1992 Consent Order and Service

---

[1] Because Dixon is an ongoing class action lawsuit, the lead Defendant's name has changed with each new mayor. See, e.g., Dixon v. Weinberger, 405 F. Supp. 974 (D.D.C. 1975); Dixon v. Barry, 967 F. Supp. 535 (D.D.C. 1997); Dixon v. Williams, No. 74-285.

Development Plan, appointment of a Special Master in 1993, and efforts to appoint a receiver).

## II. MOTION TO DISMISS

Defendants make six distinct arguments for dismissing some or all of the parties and their claims. Those arguments involve (1) whether the Dixon class action precludes this litigation, (2) whether ULS lacks adequate standing, (3) whether respondent superior principles shield Defendants from ULS's access to records claim, (4) whether Plaintiffs A and B make insufficient conclusory allegations, (5) whether the government Defendants are amenable to suit, and (6) whether the individual Defendants should be sued.

### A.  The Effect of Dixon

Defendants argue that Plaintiffs' complaint should be dismissed because the claims and relief sought are subsumed by Dixon. Courts disfavor separate lawsuits that contain overlapping claims because allowing "two or more district judges to issue directions to [the same] officials simultaneously would be to create . . . an inefficient situation, fraught with potential for inconsistency, confusion, and unnecessary expense." Groseclose v. Dutton, 829 F.2d 581, 584 (6th Cir. 1987) (internal quotation omitted). For example, when an individual lawsuit filed by a class member raises claims of a nature similar to or overlapping with a pending class action, courts have consolidated the proceedings and included the individual complaint in the class action. See id. at 582.

When a plaintiff who is not clearly part of the class files a claim, however, overlap between the two suits does not necessarily warrant such consolidation or other action dismissing the latter complaint. In Jane Does I Through III v. District of Columbia, 238 F. Supp. 2d 212 (D.D.C. 2002), for instance, the Court rejected defendants' argument that res judicata principles

barred plaintiffs' claims because of an ongoing but previously-adjudicated class action raising related issues. While the class action sought comprehensive action and general reform in the treatment of mentally retarded patients, the individual suit sought monetary and injunctive relief for a specific governmental policy of authorizing non-emergency medical procedures without the consent of institutionalized patients or their guardians. Id. at 214, 218. In finding that the two matters were not the same cause of action for claim preclusion purposes, the Court considered, among other things, "whether the facts are related in time, space, origin, or motivation." Id. at 217-18. The Court also concluded that the defendants had not shown that the plaintiffs were part of the previous class. Id. at 220-21.

In Dixon, the class is defined as "individuals who are or may be hospitalized in a public hospital under the District of Columbia's 1964 Hospitalization of the Mentally Ill Act, D.C. Code Section 21-501 et seq., and who need out placement from the public hospital to alternative care facilities." Dixon v. Barry, 967 F. Supp. at 537. Ultimately, this Court issued a final ruling on the merits that related only to outpatient care. Dixon v. Weinberger, 405 F. Supp. at 979-80. Indeed, the Court in 1988 denied a motion to intervene in the Dixon class action because the movants raised claims related exclusively to inpatient treatment and conditions. Dixon v. Bowen, No. 74-0285, at 1-2 (D.D.C. Nov. 7, 1988) ("Movants' central allegations raise factual and legal issues beyond the scope of issues litigated in Plaintiffs' original action . . . [and] nothing appears to preclude movants from filing their own, distinct lawsuit."). Thus, the Dixon class and the final order on the merits regarding outpatient care do not cover Plaintiffs' inpatient claims, especially in light of this Court's decision to exclude such claims from the litigation.

While thirty years have passed since Dixon's initial ruling, proceedings in that case

continue to this day as efforts to implement this Court's order have proven difficult. The parties here dispute whether the various implementation agreements in Dixon encompass Plaintiffs' complaint. Plaintiffs contend that Dixon has focused on outpatient treatment since its inception, as evidenced by the class definition and 1988 ruling described above. Defendants respond by arguing that, despite the state of Dixon in 1988, the scope of that case has subsequently expanded to encompass the claims at issue in the instant lawsuit.

In 1992, the Court issued a consent order and Service Development Plan to develop and implement outpatient treatment for both hospitalized and non-hospitalized class members. Dixon v. Barry, 967 F. Supp. at 539. Five years later, the Court found "gross deficiencies in treatment practice and therapeutic environment at St. Elizabeths Hospital." Id. at 542. Moreover, the subsequent Final Court-Ordered Plan, Dixon v. Williams, No. 74-285 (D.D.C. March 28, 2001) ("Dixon Plan"), addressed the construction of a new St. Elizabeths Hospital, and a 2003 Court Monitor report discussed the hospital's current physical conditions, patient load, and staffing. Defendants contend that such developments show Dixon expanding to address inpatient facilities and treatment.

A review of Dixon's recent history shows that, while Dixon has broadened in scope to encompass some inpatient-related concerns (e.g., the construction of a new St. Elizabeths Hospital and the hiring of additional staff), see, e.g., Dixon Plan at 23-24, the emphasis of that case remains on establishing a community-based mental health system. The stated goal of the Dixon Plan was to create "an integrated, comprehensive and cost-effective community-based plan for the provision of mental health care in the District," id. at 2 (emphasis added), retaining Dixon's traditional focus on the establishment and provision of outpatient services. In

5

formulating this comprehensive, system-wide plan, it did address some basic, foundational aspects of the inpatient care at St. Elizabeths Hospital.[2]  However, a significant disparity existed between the level of structure and detail between outpatient and inpatient concerns.  Indeed, when contrasted with the highly specific plans for the community-based services and systems, the plan's mention of inpatient concerns appeared secondary.  For example, it outlined the multiple components of a "pilot program . . . for adults housed on the forensic side of St. Elizabeths Hospital who . . . could benefit from living in the community and receiving recovery oriented community treatment and support," id. at 35, while stating only that "[t]here will be a minimal level of inpatient hospital services, both civil and forensic, to ensure the needs of the mentally ill are met" in the hospital, id. at 37.  Similarly, the Dixon Plan only briefly mentioned staffing concerns at St. Elizabeths Hospital but set forth a detailed, organized procedure through which the community-based programs will be structured, licensed, and monitored.  Id. at 8-19.  Thus, while the Dixon Plan did not completely ignore Plaintiffs' claims, its goal and predominant focus were to transform the current hospital-based mental health care system into a community-based system.  Such a transformation naturally has had an impact on the surviving inpatient systems, but Dixon remains mostly unconcerned with the conditions of the inpatient residents.

 Thus, despite some recent relevance to some of Plaintiffs' concerns, Dixon's evolution alone has not sufficiently included Plaintiffs' claims.  In addition, the exclusion of Plaintiffs from the Dixon class definition, this Court's rejection of an attempt by inpatients to intervene in that

---

[2] For instance, the plan provided that the DMH "will continue to run a rebuilt St. Elizabeths [Hospital] as a forensic hospital and a tertiary care facility to 'back up' the new primary . . . and secondary . . . care programs in the community . . . [and] will seek to provide high quality personnel and procurement support so that the Hospital can attract and retain quality staff."  Dixon Plan at 23-24.

case, and the lack of any final order on the merits requiring any changes to inpatient care at St. Elizabeths Hospital further support the need for a separate litigation. Even if separate but related suits have led to duplicative and/or conflicting orders in other situations, this danger is muted in this circumstance given that both cases are now overseen by the same judge. Though the Court believes that Plaintiffs should consult more fully with Dixon class counsel regarding the relief sought and other relevant matters to avoid duplicative or conflicting efforts, Defendants' motion to dismiss on this ground is denied.

### B. ULS's representational standing

Defendants urge the Court to dismiss ULS for lack of representational standing. The Supreme Court set forth the relevant rule for such standing in Hunt v. Washington State Apple Advertising Commission:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. 333, 343 (1977).

Defendants argue that ULS does not meet the first prong by attacking its status as an association with "members." Specifically, Defendants argue that the St. Elizabeths Hospital inpatients are not clients of ULS. However, ULS satisfies the first prong of Hunt because its complaint, filings, and supporting affidavits identify its constituents,[3] including Plaintiffs A

---

[3] ULS is a federally-authorized protection and advocacy organizations under the Protection and Advocacy for Individuals with Mental Illnesses Act ("PAIMI"), which was passed to "assist States to establish and operate a protection and advocacy system for individuals with mental illnesses which will protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes; and investigate

and B, as having been injured by the statutes challenged in this case.[4]  Thus, ULS clearly has constituents who would otherwise have standing to sue in their own right.

Defendants also argue that Plaintiffs do not meet the third prong of <u>Hunt</u> because the participation of St. Elizabeths' patients is required in this lawsuit.  However, this argument must be rejected on either of two grounds:  the Plaintiffs need not satisfy this prong, and they would meet its requirement even if they did.

First, PAIMI has freed Plaintiffs from the third requirement of standing under <u>Hunt</u>.  Because this third prong is a prudential standing factor of "administrative convenience and efficiency" and not a constitutional requirement like the other two prongs, <u>United Food & Commercial Workers Union v. Brown Group, Inc.</u>, 517 U.S. 544, 557 (1996), Congress can abrogate or override this requirement as it has done through PAIMI.  <u>Oregon Advocacy Ctr. v. Mink</u>, 322 F.3d 1101, 1113 (9th Cir. 2003) ("[B]ecause Congress authorized advocacy and protection organizations . . . to sue on behalf of those suffering from mental illness, and because

---

incidents of abuse and neglect of individuals with mental illnesses." 42 U.S.C. § 10801(b) (internal subdivisions omitted).  Plaintiffs clearly satisfy the second prong of <u>Hunt</u> by seeking to protect interests germane to this organizational purpose, which Defendants do not dispute.

[4] Defendants extract language from <u>Doe v. Stincer</u>, 175 F.3d 879 (11th Cir. 1999), to argue that PAIMI entities like ULS must be representing their "clients" in such lawsuits.  While <u>Doe</u> did fault the affidavit submitted to support associational standing for failing to "state that any of [the allegedly aggrieved] persons were [the entity's] clients," the court was focusing on the organization's failure to identify even one constituent that was injured based on the statute at issue.  <u>Id.</u> at 887.  ULS clearly has made such a showing.  Indeed, the <u>Doe</u> court had already made clear that such entities need not have actual "members" for such standing.  <u>Id.</u> at 885 ("[A]s in <u>Hunt</u>, Congress designated the Advocacy Center, like other protection and advocacy systems, to serve a specialized segment of the community which is the primary beneficiary of its activities, including prosecution of this kind of litigation. . . .  Accordingly, we conclude that the Advocacy Center <u>may sue on behalf of its constituents like a more traditional association may sue on behalf of its members.</u>") (emphasis added) (internal quotations and alterations omitted).

the only impediment to such a suit is a prudential one, . . . Congress abrogated the third prong of the Hunt test."); see also Doe, 175 F.3d at 883.

Specifically, the relevant provisions of PAIMI state that entities like ULS have the authority to do the following:

> (B) pursue administrative, legal, or other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and
>
> (C) pursue administrative, legal, and other remedies on behalf of an individual . . . with mental illness[] and . . . [who] is a resident of the State, but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment[.]

42 U.S.C. § 10805(a)(1). Thus, PAIMI authorizes organizations like ULS to pursue claims for system-wide change on their own behalf as an advocacy organization under § 10805(a)(1)(B) and seek legal remedies on behalf of individuals meeting the criteria under § 10805(a)(1)(C). By providing such entities this authority to sue on behalf of their constituents, Congress has cleared away any non-constitutional impediments for ULS -- including the third prong of Hunt -- in the situations stated in § 10805. Mink, 322 F.3d at 1113; see also United Food, 517 U.S. at 555-58.

Defendants contend that ULS's claims are on behalf of individual patients that do not meet the discharge criteria of § 10805(a)(1)(C). As such, they argue that Hunt's third prong is still operative in light of the limited authority granted by Congress. However, construed in the manner most favorable to Plaintiffs, ULS's complaint clearly seeks system-wide reform rather than individualized relief. Thus, its claims fall under § 10805(a)(1)(B), making the third requirement from Hunt inapplicable.

Second, even if the third prong did apply here, ULS would satisfy it. Defendants claim

that ULS will have to rely on the individualized participation of its constituents, in the form of testimony and affidavits, to prove its claims. However, rather than seeking individualized relief, ULS seeks injunctive remedies that would bring institution-wide relief for its constituents. ULS could meet its burden by presenting evidence of its claims of institutional neglect and other problems through the use of medical records, audits, depositions of Defendants, expert and fact witness testimony, and other relevant documents and written discovery. The mere need to show individualized harm to the patients is not enough to offend Hunt's third prong without a clear need for their direct participation in the litigation itself. "[T]hough the unique facts of each . . . member's claims will have to be considered . . . the [association] can litigate this case without the participation of those individual claimants." International Union v. Brock, 477 U.S. 274, 288 (1986). Thus, ULS would meet this requirement from Hunt if it were to apply here.

In any event, ULS should not be dismissed as it has standing given its own statutory right under 42 U.S.C. § 10805 to sue for the records and other information denied to it by Defendants. As the Eleventh Circuit has noted, "[b]ecause the organization itself ha[s] a right to the records, it ha[s] standing to sue to redress the injury caused by the facility's refusal to provide those records." Doe, 175 F.3d at 883. Therefore, in light of the various reasons described above, Defendants' motion to dismiss on this ground is denied.

### C. Respondent superior principles

Defendants move to dismiss ULS's claim that the DMH denied its request for records in violation of PAIMI and 42 U.S.C. § 1983, arguing that ULS has not identified a municipal policy or custom that caused the injury as required to establish § 1983 liability. A plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom'

that caused the plaintiff's injury." Board of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Where a plaintiff alleges a violation pursuant to a municipality's policy that was implemented by a person with policymaking authority, that plaintiff has presented an actionable claim. E.g., Pembaur v. Cincinnati, 475 U.S. 469, 479-81 (1986). Construing the complaint most favorably to the non-movants, ULS has sufficiently alleged municipal behavior that could be interpreted as a policy and the relevant policymaking authority of Defendants. Therefore, the motion to dismiss ULS's access to records claim is denied.

### D. Individual Plaintiffs' allegations

Defendants urge this Court to dismiss Plaintiffs A and B, arguing that these Plaintiffs make only insufficient conclusory allegations. A motion to dismiss for such a reason should only be granted if it is beyond doubt that the plaintiff can prove no set of facts to support the claim for relief. E.g., Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1086 (D.C. Cir. 1998). While bare conclusions of law or sweeping and unwarranted averments of fact may not be enough to survive such a motion, Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987), there is no requirement to plead facts sufficient to prove the allegations beyond a short and plain statement of the claim showing an entitlement to relief, Covad Communications Co. v. Bell Atl. Corp., 398 F.3d 666, 671 (D.C. Cir. 2005). Here, Plaintiffs' complaint has numerous allegations of inadequate treatment, poor living conditions, improper maintenance of facilities, and other institutional problems. E.g., Compl. ¶¶ 2, 23-39. In addition, there appear to be sufficient allegations regarding municipal policy. In construing the complaint in a manner most favorable to Plaintiffs, the Court must deny Defendants' motion to dismiss these individual claims.

### E. Suing governmental entities

Defendants' motion to dismiss the DMH and St. Elizabeths is granted because these two entities are not sui juris. A District agency cannot be sued in the absence of a statute making the agency amenable to a suit, e.g., Trifax Corp. v. District of Columbia, 53 F. Supp. 2d 20, 26 (D.D.C. 1999), and no such statute exists for the DMH or St. Elizabeths Hospital.[5]

### F. Individual Defendants

Defendants also seek to dismiss the individual Defendants. Although "local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which . . . a local government would be suable in its own name," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 n.55 (1978), a "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Therefore, "[t]here is no . . . need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages or injunctive or declaratory relief." Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985). While this equivalence between suits against officials and government units does not require dismissal of the public officials, Winder v. Erste, No. 03-2623, 2005 WL 736639, at *5 (D.D.C. Mar. 31, 2005), the Court has the discretion to disallow such a suit to proceed against officials in their official capacity, Robinson v. District of Columbia, No. 03-1455, 2005 WL 491467, at *3 (D.D.C. Mar. 2, 2005) (dismissing Mayor Williams from suit when named only in his official capacity); see also Winder, 2005 WL 736639, at *5 (choosing not to dismiss certain

---

[5] Plaintiffs have conceded that these Defendants should be dismissed. Pls.' Opp'n to Defs.' Mot. to Dism. at 26.

District officials). The Court believes that including these individual District officials in this suit is redundant and unnecessary, so the motion to dismiss the individual Defendants is granted.

## II.  MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs' motion for a preliminary injunction is denied at this time because they have not provided adequate evidence to carry their burden of proof in showing that immediate and irreparable harm will result if the relief is not granted. The burden of proof lies with Plaintiffs to show that injunctive relief is appropriate, Dani Enters. v. Small Bus. Admin., 757 F. Supp. 99, 106-07 (D.D.C. 1991), and "if there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required," Cobell v. Norton, 391 F.3d 251, 261 (D.C. Cir. 2004). Here, genuine issues of material fact exist. While Plaintiffs have argued that the hospital conditions present the inpatients with constant and immediate dangers that constitute irreparable harm, Defendants have responded with enough evidence to create a genuine dispute of material fact on this issue. See, e.g., Defs.' Mem. of Pts. & Auth. in Opp'n to Pls.' App. for Prelim. Inj. at 4, 17 (citing hospital audit that found an absence of imminent danger to the patients regarding various institutional problems). Rather than seeking the evidentiary hearing now needed to determine whether the burden of proof has been met, Plaintiffs firmly asserted during its oral argument that no such hearing was requested or desired. Thus, at this time, they have not shown that irreparable harm will result if the Court does not grant the requested relief. Accordingly, Plaintiffs' motion is denied.

## III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss St. Elizabeths Hospital, the DMH, and the individual Defendants from this lawsuit but otherwise denies

Defendants' motion to dismiss as to all other parties. Further, the Court denies Plaintiffs' motion for a preliminary injunction at this time.

In addition, the Court recommends that this matter be submitted to mediation ahead of the status conference described in the accompanying Order. That mediation -- which may utilize a court-appointed mediator, an independently selected mediator approved by all parties, or this Court's mediation process -- should include the parties to this litigation, the <u>Dixon</u> class counsel, and Court Monitor Dennis R. Jones.

July 22, 2005

                                            Thomas F. Hogan
                                            Chief Judge